**Joseph D. FARACI**

v.

**James L. GRACE, et al.**

**No. Civ.A.04–1163.**

United States District Court, E.D. Pennsylvania.

Aug. 16, 2004.

Joseph D. Faraci, Huntingdon, PA, pro se.

## MEMORANDUM

DALZELL, District Judge.

This is the Court of Chancery; ... which so exhausts finances, patience, courage, hope; so overthrows the brain and breaks the heart; that there is not an honourable man among its practitioners who would not give—who does not often give—the warning, "Suffer any wrong that can be done you, rather than come here!"

Charles Dickens, Bleak House 2–3 (Oxford Univ. Press 1996) (1853).

One could not fault Joseph Faraci if he shared Dickens's low esteem for the courts, for today's first-year law students were in kindergarten when he first raised the collateral attack now before us. After sixteen years, no court has ruled on his claims. Indeed, we have twice before in the name of comity declined to reach the merits of his case, without peering too deeply into the procedural abyss. But no more. When Faraci's case reached us for the third time, we could no longer ignore this Dickensian history.

Still, as is often the case in *pro se* matters, the record was insufficiently clear to suggest the proper course. Over the past few months, we have unearthed a heap of records from the state and federal courts, and these documents have allowed us to cobble together a reasonably coherent explanation of the events that have delayed Faraci's case for so long. We now summarize the product of that labor so that Faraci, the Public Defender, the District Attorney, and state and federal judges will have

a more complete understanding of how this saga could happen a century and a half after Dickens exposed the London Court of Chancery.

*Factual Background*

### A. *Preliminary Stages*

This case began with a heinous crime. On February 13, 1980, Faraci and Richard Marsden, both armed, broke into Allen Foard, Jr.'s home to steal a .357 Magnum. Marsden woke Foard up, ordered him to produce the gun, and—after Foard complied—shot him four times. Foard died. *See Commonwealth v. Faraci,* 319 Pa.Super. 416, 466 A.2d 228, 229–30 (1983).

Two weeks later, the District Attorney filed two informations against Faraci and Marsden in the Bucks County Court of Common Pleas (the "Bucks County court"). The first information, which was docketed in criminal case number 1980–1090, charged Faraci and Marsden with murder. A second information, assigned criminal case number 1980–1091, charged Faraci and Marsden with burglary, robbery, theft, possessing instruments of crime, prohibited offensive weapons, and criminal conspiracy (the "lesser charges"). Ex. 5. Marsden pled guilty to many of the charges on June 2, 1980, Ex. 2, at 1, but Faraci elected to contest all of them.

On June 10, 1980, after a lengthy trial, a jury convicted Faraci of second-degree murder and all of the lesser charges. *See* Ex. 1, at 2; *Faraci,* 466 A.2d at 230. On October 30, 1981, the Honorable Kenneth G. Biehn sentenced Faraci to between two and five years' imprisonment on the lesser charges, followed by a life term for second-degree murder. Ex. 1, at 2–3. On appeal, Faraci raised several arguments, but the Superior Court agreed only with his claim that Judge Biehn should have ordered a pre-sentence report before sentencing him

on the lesser charges. *Faraci,* 466 A.2d at 233. After ordering and reviewing a pre-sentence report, Judge Biehn, on March 23, 1984, reimposed a sentence of life imprisonment for the second-degree murder conviction and a sentence of between two and five years' imprisonment on the lesser charges. Ex. 1, at 3.

Though Faraci did not appeal the corrected sentence, on March 20, 1985, he filed a petition for collateral relief under Pennsylvania's Post Conviction Hearing Act ("PCHA"), 42 Pa. Cons.Stat. §§ 9541–9551 (1985) (the "1985 state petition"). Ex. 6. On February 13, 1987, Judge Biehn filed a thorough opinion denying the 1985 state petition. Ex. 7. The Superior Court affirmed the denial of the petition on January 4, 1988, Ex. 8, and the Pennsylvania Supreme Court denied Faraci's petition for allowance of appeal on May 18, 1988, Ex. 9.

Undeterred by the rejection of the 1985 state petition, Faraci, on August 8, 1988, filed a petition challenging his conviction under Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. Cons.Stat. §§ 9541–9546 (2004) [1] (the "1988 state petition"). Ex. 1, at 4; *see also* Ex. 10. The Honorable Isaac S. Garb promptly appointed the Public Defender to represent Faraci, and the Commonwealth responded to the petition on December 19, 1988. *Id.*

### B. *Marsden's Petitions*

We pause to examine co-defendant Marsden's experience because, as will become apparent, it is highly pertinent to Faraci's history.

On September 16, 1988—that is, soon after Faraci filed his 1988 state petition—Marsden sent a motion for production of trial transcripts and other related documents (the "Motion") to the Clerk of the

---

**1.** Effective April 13, 1988, the PCRA replaced the PCHA as the Pennsylvania statute governing petitions for collateral relief from a criminal conviction. *See* 1988 Pa. Laws 336.

Bucks County court (the "Clerk"). Ex. 11. When Marsden inquired about the status of his Motion in November of 1988, the Clerk explained that it had been forwarded to the "Court Administrator for the Judge's signature." Ex. 12. On April 6, 1989, Marsden filed a petition for writ of habeas corpus with the Bucks County court ("Marsden's 1989 state petition"), alleging that the failure to provide transcripts deprived him of an opportunity to appeal his conviction. Ex. 13. Marsden on October 29, 1989, again asked the Clerk about the status of his Motion and his 1989 state petition, and a deputy Public Defender (to whom the Clerk apparently had forwarded Marsden's letter) reported that he could "find no cases with [the] number" 1980–1090 or 1980–1091. Ex. 14.

We can only speculate about where these files might have lodged in late 1989, while Marsden's 1989 state petition and—more importantly for our purposes—Faraci's 1988 state petition were still pending. Perhaps the Public Defender could not locate the files because the Court Administrator was reviewing them. Whatever the case, the Public Defender's inquiries appear to have motivated the Court Administrator to respond to Marsden's submissions because, on December 5, 1989, an assistant Court Administrator finally acknowledged receiving Marsden's 1989 state petition. Still, the assistant Court Administrator refused to submit the petition to a judge because, in his "experience[,] self represented defendants ... are unable to secure their appearance at any hearing that may be required." Ex. 15. The assistant Court Administrator did not address Marsden's motion for production of trial transcripts. Although he forwarded the 1989 state petition to a defense attorney "for review and assistance," *id.*, the attorney never filed any papers on Marsden's behalf, and the Clerk never docketed Marsden's Motion or his 1989 state petition. *See* Ex. 2.

Stymied by the state system, Marsden filed a petition for writ of habeas corpus in this Court on May 1, 1990 ("Marsden's 1990 federal petition"). Ex. 16. To evaluate the merits of the petition, Magistrate Judge Scuderi ordered the Bucks County Clerk to send file numbers 1980–1090 and 1980–1091 to our Court. *Id.* After our late colleague, Judge Broderick, denied Marsden's 1990 federal petition, and our Court of Appeals denied his request for a certificate of probable cause, Judge Broderick's deputy clerk returned the files to the Bucks County court. The files had been in federal custody between June of 1990 and June of 1991. *See id.*

We have described at some length Marsden's early petitions because their handling helps explain some of the inordinate delay in Faraci's case. As noted earlier, documents related to Marsden and those related to Faraci were both filed in criminal numbers 1980–1090 and 1980–1091. Because the Court Administrator and our Court were reviewing those files in connection with Marsden's petitions at the time when Faraci filed his 1988 state petition, the files were not available to the Bucks County court, and it could not act immediately on Faraci's petition.

On April 26, 1991, Marsden filed a PCRA petition in the Bucks County court ("Marsden's 1991 state petition"). Ex. 2, at 2; *see also* Ex. 18. The Clerk docketed Marsden's petition in criminal numbers 1980–1090 and 1980–1091, *see* Ex. 3, at 5; Ex. 4, at 4, because both of the files at that time contained documents pertaining to Marsden. Judge Biehn dismissed Marsden's 1991 state petition on August 24, 1993, Ex. 19, and the Superior Court affirmed that decision on May 3, 1994, Ex. 20.

## C. *The Lost Years*

On March 11, 1991, Faraci filed a supplement to his 1988 state petition (the

"1991 supplement") with the Bucks County court. Ex. 1, at 4; *see also* Ex. 17. We note that Faraci filed the 1991 supplement while this Court still held file numbers 1980–1090 and 1980–1091, *see* Ex. 16, and it seems that their absence prevented the Bucks County court from re-discovering the 1988 state petition when Faraci filed the 1991 supplement.

After waiting more than a year for the Bucks County court to respond to the 1991 supplement, Faraci filed his first petition for a writ of habeas corpus in this Court on May 26, 1992 (the "1992 federal petition"). Ex. 21. The petition was randomly assigned to us, and we referred the matter to Magistrate Judge Melinson for a Report and Recommendation. When the Bucks County District Attorney's Office learned of the 1992 federal petition, it asked Judge Biehn to schedule a hearing on Faraci's 1988 state petition. On August 3, 1992, Judge Biehn obliged by setting a hearing for October 1, 1992. Ex. 22. The District Attorney then informed Judge Melinson of the impending hearing, and—though he noted "an unexplained delay in the state court," Ex. 23, at 4–5—Judge Melinson recognized that the October 1, 1992 hearing would provide the Bucks County court with an opportunity to address the merits of Faraci's 1988 state petition. Because Faraci had not exhausted his state remedies before filing his 1992 federal petition, Judge Melinson recommended that we dismiss the petition without prejudice. Ex. 23. We adopted that recommendation on August 31, 1992. Ex. 24.

On September 30, 1992, the Public Defender requested a continuance of the October 1, 1992 hearing because file numbers 1980–1090 and 1980–1091 were not available for her to review.[2] Ex. 26. Judge Biehn agreed to continue the case, *see* Ex. 25, and later rescheduled the hearing for November 23, 1992, Ex. 26. The Clerk, however, failed to inform the Public Defender of the new date, Ex. 27, so Judge Biehn postponed the hearing until February 8, 1993. *Id.*

The February 8, 1993 hearing was neither held nor continued. *See* Ex. 1, at 4. Indeed, the Bucks County court appears to have lost track of Faraci's 1988 state petition sometime during 1993, perhaps because it was concentrating on Marsden's 1991 state petition. *See* Ex. 2, at 2. As we have already mentioned, the court denied Marsden's 1991 state petition on August 24, 1993. Ex. 19.

### D. *Rediscovery of the 1988 State Petition*

Although the February 8, 1993 hearing was never held, Faraci did not contact the Bucks County court about the status of his 1988 state petition for more than eight years.[3] On October 25, 2001, he finally contacted the Clerk for an explanation of the long delay. Ex. 29. The Clerk explained that his "PCRA petition was denied and dismissed on August 24, 1993" and the "Superior Court affirmed that decision on November 22, 1994." *Id.* We now know, of course, that the Clerk was referring to the resolution of Marsden's 1991 state petition.[4] Until very recently, however, the dockets in criminal numbers

2. After resolving Faraci's 1992 federal petition, our Court had not yet returned the files to the Bucks County court. *See* Ex. 26.

3. Although Faraci did not contact the Bucks County court, he repeatedly pressed his counsel, the Public Defender, about the status of his 1988 state petition. *See* Ex. 28. The

Public Defender never contacted the court on his behalf.

4. The Clerk incorrectly reported that the Superior Court rendered its decision on November 22, 1994, when the actual decision was dated May 3, 1994, because the Bucks County court received and docketed the Superior

1980–1090 and 1980–1091 contained entries related to both Marsden and Faraci, making it extremely difficult to distinguish resolved petitions from pending ones. *See* Exs. 3, 4.[5]

At any rate, Faraci became understandably concerned when he learned that the Bucks County court believed that it had already dismissed his 1988 state petition, so he filed a second petition for writ of habeas corpus with this Court on March 21, 2002 (the "2002 federal petition"). Ex. 30. The 2002 federal petition alerted the District Attorney to the fact that the 1988 state petition was still pending, and the District Attorney apparently passed that knowledge along to Judge Biehn, who set a hearing for September 26, 2002. Ex. 31. The District Attorney also requested that this Court stay the 2002 federal petition until the Bucks County court had another opportunity to address the 1988 state petition, and Judge Melinson recommended that we follow that approach because Faraci, through no fault of his own, had still failed to exhaust his state remedies. *See* Ex. 32, at 4–5. On August 29, 2002, we chose to dismiss—rather than stay—Faraci's 2002 federal petition without prejudice to his right to refile "[a]fter resolution of his pending PCRA petition, including appellate review." Ex. 33, at 3.

On September 26, 2002, the Bucks County court convened its first ever hearing on Faraci's 1988 state petition. Ex. 34.

Due to some confusion at the Public Defender's office, Faraci's attorney, John R. Fagan, was not prepared for the hearing, *see id.* at 10, so Judge Biehn continued the hearing to allow Fagan to prepare adequately. The judge directed Fagan to request a hearing date because he "d[id]n't want to lose track of this case anymore." *Id.* at 13. When Fagan requested that a hearing be scheduled for November 7, 2002, Ex. 35, Judge Biehn granted that request, *see* Ex. 36.

The November 7, 2002 hearing never convened. The Public Defender's office apparently reassigned Faraci's case from Fagan to Christina A. King, and King requested a continuance because the Bucks County court's records were not sufficiently clear for her to determine whether Faraci's 1988 state petition attempted to relitigate previously decided issues. *See* Ex. 37. King also suggested that the continuance was necessary so that Faraci, who was temporarily housed in Bucks County, could retrieve his copies of several necessary documents from the facility to which he was permanently assigned.[6] The day before the hearing was to start, Judge Biehn granted King's request but did not set a new hearing date. *Id.*

After months passed without word of a new hearing, Faraci again took matters into his own hands by filing a *pro se* petition for extraordinary relief[7] in the

Court order on November 22, 1994. *See* Ex. 3, at 5; Ex. 20.

**5.** Over the past few months, Erin Martin, Deputy Clerk of the Bucks County court, has worked diligently to loosen the Gordian Knot that the dockets had become. After wading through the bog of documents in criminal numbers 1980–1090 and 1980–1091, she assigned those related to Faraci to criminal number 1980–1090 and those related to Marsden to criminal number 1980–1091. *See* Exs. 1, 2. This simple administrative solution has proven immensely helpful to us and may pre-

vent future confusion about the status of Faraci's case in state court.

**6.** The original documents had apparently disappeared from the Bucks County court's files.

**7.** Faraci's petition for extraordinary relief requested that the Supreme Court appoint new counsel for him because he claimed that the Public Defender's Office had "not acted as an effective advocate." *See* Ex. 38, at 4. The petition also asked the Supreme Court to direct the Bucks County court to schedule a hearing on his 1988 state petition. *Id.*

Pennsylvania Supreme Court on July 1, 2003. Ex. 38. Just as the 1992 federal petition led to the October 1, 1992 hearing and the 2002 federal petition resulted in the September 26, 2002 hearing, Faraci's petition for extraordinary relief prompted the Bucks County court to schedule another hearing for August 6, 2003. Ex. 39.

At a hearing of August 8, 2003,[8] King informed Judge Biehn that Faraci had not provided her with his copies of the documents that were missing from the court's files.[9] *See* Ex. 40, at 10–11. She also explained that Faraci wanted her removed as counsel and that he believed that his petition for extraordinary relief deprived the Bucks County court of jurisdiction over his 1988 state petition. *See id.* at 15. On the record, Faraci himself stated that he did not want to proceed with the hearing on August 8, 2003. *Id.* at 17. Understandably frustrated by the further delays, Judge Biehn reluctantly continued the hearing pending the Supreme Court's resolution of Faraci's petition for extraordinary relief. *Id.* at 19–20. Although Judge Biehn admitted that some of the delays were not Faraci's "fault," he also believed that many of the more recent disruptions arose because Faraci had not "seen fit to cooperate." [10] *Id.*, at 20–21. Judge Biehn left the burden on King to request another hearing after the Supreme Court ruled on Faraci's petition for extraordinary relief. *See id.* at 19–20.

On February 2, 2004, the Supreme Court denied Faraci's petition for extraor-dinary relief, Ex. 41, and this setback spurred Faraci to file his third petition for writ of habeas corpus in this Court on March 18, 2004 (the "2004 federal petition" or the "instant petition"). Ex. 42. As in 1992 and 2002, as soon as the District Attorney notified the Bucks County court of the pending federal petition. Judge Biehn scheduled a hearing on the 1988 state petition. *See* Ex. 43.

This most recent hearing took place on June 16, 2004, and King again was not prepared to proceed because Faraci still had not provided her with copies of the missing documents. *See* Ex. 44, at 9–10. Judge Biehn ordered Faraci to provide those documents to King within ten days and directed King to request a hearing after she had reviewed the materials. *See id.* at 12, 14–15. When Faraci explained that the prison would not allow him to mail so many documents, Judge Biehn ordered the Commonwealth to pay for copying the documents. *See id.* at 13. Finally, almost twenty-four years to the day since he presided over Faraci's trial, Judge Biehn expressed his hope to resolve this "ridiculous" case before he retired. *See id.* at 15.

We do not know whether Faraci has complied with the order to cooperate with King, or if the Commonwealth has actually paid for the copying, but Judge Biehn has scheduled another hearing on the 1988 state petition for August 25, 2004. Ex. 45.

*Legal Analysis*

 Under ordinary circumstances, we cannot entertain a petition for writ of ha-

---

**8.** It is not clear when or why the hearing was rescheduled from August 6, 2003 to August 8, 2003.

**9.** Faraci offered to copy the 987 pages of "documentation" that he had in his possession, but he asked King to send him one hundred dollars to cover the copying costs. Instead, she suggested that he simply send the original documents to her, and he declined to do so. *See* Ex. 40, at 11.

**10.** Although we sympathize with Judge Biehn's disappointment that Faraci's failure to trust even his own counsel made resolving his petition more difficult, we also understand why Faraci would hesitate to give up what appear to be the only extant copies of documents that may secure his freedom. In light of the repeated mishandling of other records in this case, we would be surprised if Faraci acted any differently.

beas corpus until after the petitioner has exhausted his state remedies. 28 U.S.C. § 2254(b)(1)(A) (2004). "However, exhaustion is not jurisdictional, but a matter of comity," *Story v. Kindt*, 26 F.3d 402, 405 (3d Cir.1994), so we may dispense with the exhaustion requirement when "circumstances exist that render [the state] process ineffective to protect the rights of the applicant," 28 U.S.C. § 2254(b)(1)(B)(ii) (2004). One of these circumstances is an inordinate delay in the state court, and our Court of Appeals has repeatedly held that the respondent bears the burden of demonstrating why the petitioner should be required to exhaust theoretically available state remedies when inordinate delay has practically foreclosed the possibility of state review. *See, e.g., Lee v. Stickman*, 357 F.3d 338, 341 (3d Cir.2004); *Story*, 26 F.3d at 405; *Burkett v. Cunningham*, 826 F.2d 1208, 1218 (3d Cir.1987); *Wojtczak v. Fulcomer*, 800 F.2d 353, 355–356 (3d Cir. 1986); *Codispoti v. Howard*, 589 F.2d 135, 142 (3d Cir.1978).

█ Although the respondents are well aware of the instant petition, *see* Ex. 43, at 7, we have not formally ordered them to respond to it, so we cannot fault them for failing to justify the sixteen-year delay in resolving Faraci's 1988 state petition. We doubt, however, that respondents could ever rationalize—or would even have the temerity to attempt to defend—the delay in this case. Indeed, in a less egregious case, our Court of Appeals this year expressed its view that it would be "difficult to envision any amount of progress justifying an eight-year delay in reaching the merits of a petition." *Lee*, 357 F.3d at 342. Not only is the delay in this case *twice* as long as the one that the *Lee* panel found inexcusable, but the state trial and intermediate appellate courts had each already considered Lee's state petition when the Court of Appeals held that his federal petition could proceed without exhausting state remedies. Here, the Bucks County court has convened a few preliminary hearings, but it has not even decided if Faraci's 1988 state petition is procedurally barred, much less reached the merits of his claims. Even if the respondents could satisfactorily explain this interminable delay, however, we need not dismiss Faraci's 2004 federal petition.

It appears that the instant petition contains both exhausted and unexhausted claims. *See* Ex. 40, at 21–22 (reporting the Commonwealth's position that the claims in Faraci's 1988 state petition—some of which are also raised in his 2004 federal petition—had already been litigated or waived). More than twenty years ago, the Supreme Court held that, "because a total exhaustion rule promotes comity and does not unreasonably impair the prisoner's right to relief, . . . a district court must dismiss habeas petitions containing both unexhausted and exhausted claims." *Rose v. Lundy*, 455 U.S. 509, 522, 102 S.Ct. 1198, 1205, 71 L.Ed.2d 379 (1982). Dismissal was a sensible procedure at the time because a petitioner could assert all of his claims in a new petition after first submitting the originally unexhausted claims to a state court.

Section 101 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214, 1217 (codified at 28 U.S.C. § 2244(d)), however, imposed a new one-year statute of limitations on all claims brought in state prisoners' petitions for writs of habeas corpus. The one-year limitation created the possibility that dismissing all claims in mixed petitions would effectively bar future assertions of the exhausted claims because adjudication of the unexhausted claims would often take so long that a prisoner could not refile a petition until after the statute of limitations had expired.

Our Court of Appeals recently noted that the AEDPA's procedural changes seriously undermined the Supreme Court's reasoning in *Lundy*. *See Crews v. Horn*, 360 F.3d 146 (3d Cir.2004). "By introducing a time limit," the court explained, "AEDPA calls into doubt the conclusion in *Lundy* that dismissal of a mixed petition does not 'unreasonably impair the prisoner's right to relief.'" *Id.* at 151. To protect state prisoners' access to habeas relief, the court followed *Zarvela v. Artuz*, 254 F.3d 374 (2d Cir.), *cert. denied*, 534 U.S. 1015, 122 S.Ct. 506, 151 L.Ed.2d 415 (2001), and held that "district courts have the discretion to stay mixed habeas corpus petitions, but ... when an outright dismissal could jeopardize the timeliness of a collateral attack, a stay is the only appropriate course of action." *Crews*, 360 F.3d at 154. Staying a mixed petition ensures that AEDPA will not bar the exhausted claims (as long as the mixed petition was itself timely filed); a stay also respects principles of comity by providing state courts with an opportunity to consider the unexhausted claims in the first instance. After the state court has ruled on those claims, the petitioner must return to federal court within a "reasonable interval, normally 30 days," or the court should vacate

the stay *nunc pro tunc* as of the date it was entered. *Id.; see also Zarvela*, 254 F.3d at 381.

The evolution of the law on mixed petitions explains the twists and turns of this case through our Court and illuminates how we hope Faraci's case will proceed. Faraci filed his 1992 federal petition when *Lundy* was in full flower, and long before the AEDPA, so we properly dismissed that petition without prejudice for failure to exhaust state remedies. *See* Ex. 24. When Faraci filed his 2002 federal petition a decade later, the AEDPA had become well-entrenched, but our Court of Appeals had not yet explained its effect on *Lundy*. Given this legal uncertainty and confident that the doctrine of equitable tolling [11] would ensure that the AEDPA did not unfairly bar Faraci's exhausted claims, we again dismissed his entire petition without prejudice. *See* Ex. 33. With the benefit of *Crews*, it is now clear that we must stay mixed petitions, including Faraci's 2004 federal petition.[12]

*Conclusion*

Sixteen years have already passed since Faraci filed his 1988 state petition, and the Bucks County court has failed to act. This interminable delay almost certainly excus-

11. *See generally Miller v. New Jersey State Dep't of Corrections*, 145 F.3d 616, 618–619 (3d Cir.1998) (explaining that equitable tolling is available when "the petitioner has in some extraordinary way ... been prevented from asserting his or her rights" and can show that he or she "exercised reasonable diligence in investigating and bringing the claims").

12. The exhausted claims, if any, in Faraci's 2004 federal petition deserve a word or two more. Because Faraci could only have exhausted those claims in his direct appeal or in the litigation surrounding his 1985 state petition, the state courts' resolution of them would have become final some time before April 24, 1996. Thus, the AEDPA required that Faraci raise them in this Court before

April 23, 1997. *See Burns v. Morton*, 134 F.3d 109, 111 (3d Cir.1998) (holding that the statute of limitations for filing a § 2254 petition begins to run on April 24, 1996 if the challenged conviction became final before that date). Although Faraci did not reassert the exhausted claims until he filed his 2002 and 2004 federal petitions, *see* Exs. 30, 42, the doctrine of equitable tolling probably excuses his untimeliness. The combination of the (perhaps) unprecedented delay in the Bucks County court, the significant changes in federal habeas law during the intervening years, and our own repeated dismissal of his earlier federal petitions created a unique and exceptional constellation of circumstances that would have prevented any *pro se* litigant from complying with the AEDPA's strict deadlines, despite the exercise of due diligence.

es Faraci's failure to exhaust his state remedies. Faithful to jurisprudence that exalts comity, we shall nevertheless stay this action so that the state courts will have one final opportunity to discharge their duty.

Judge Biehn's comments at the September 26, 2002, August 8, 2003, and June 16, 2004 hearings suggest a growing level of concern for the long-awaited disposition of the claims in Faraci's 1988 state petition *and* the 1991 supplement. *See* Exs. 10, 17.[13] We therefore harbor some hope that the case will at last move smoothly through the state courts in the coming weeks and months.

To do what we can to close the *Bleak House* door, we have gathered and bound all of the documents referred to in this Memorandum into one Appendix. We shall file the Appendix and make copies available for the asking to the parties and the Bucks County court. To that end, we also admonish Faraci to cooperate fully with his attorney and all state judges.[14] After the Pennsylvania courts have finally resolved the issues in his 1988 state petition *and* 1991 supplement, Faraci should—

within thirty days—file a motion to lift the stay in this case.[15] Finally, we shall direct the respondents to keep us abreast of the developments in the state court so that Faraci can be sure that this tribunal will not forget him.

An appropriate Order follows.

### ORDER

AND NOW, this 16th day of August, 2004, upon consideration of Joseph D. Faraci's *pro se* petition for a writ of habeas corpus (docket entry # 1) and in accordance with the accompanying Memorandum, it is hereby ORDERED that:

1. Our Order of May 6, 2004 is VACATED;

2. By August 23, 2004, Robert Mancini, Esq. shall SERVE this Order and the accompanying Memorandum (along with the Appendix thereto) on each of the respondents;[16]

3. By August 30, 2004, counsel for the respondents shall ENTER an appearance in this action;

4. On October 1, 2004 and on the first business day of every month thereafter

---

13. By filing his petition for extraordinary relief with the Pennsylvania Supreme Court and by not promptly providing his attorney with copies of the relevant documents, Faraci bears some responsibility for the more recent delays. Nevertheless, we fully understand why he took these rather extreme steps when the state courts had failed for fourteen years to decide his case.

14. It only came to our attention today that Faraci on July 27, 2004 mailed a "motion for change of court-appointed counsel" in the Bucks County PCRA proceeding. *See* Ex. 46. While Faraci is privileged to press that motion before Judge Biehn when the hearing reconvenes on August 25, in view of the inordinate delay that we have canvassed here, he may wish to reconsider the wisdom of a course that can only prolong the state proceedings even more.

In any event, we shall not lift the stay and consider the availability of habeas relief until he has exhausted his state remedies.

15. If Faraci fails to move to lift the stay within this window, we shall vacate the stay *nunc pro tunc* as of today's date. *Crews*, 360 F.3d. at 154. After vacating the stay, we will then consider the timeliness of Faraci's 2004 federal petition. Though it now appears that the doctrine of equitable tolling would excuse his delays thus far, *see supra* note 12, the equitable balance could well shift if Faraci fails to timely move to lift the stay. In that case, his failure to exercise due diligence could render the doctrine wholly inapplicable and, thus, result in dismissal of the instant petition.

16. Because Faraci's 2004 federal petition is Exhibit 42 in the Appendix, service of the Appendix constitutes service of the petition.

(until Faraci has exhausted his right to appeal resolution of his 1988 state petition, as amended by the 1991 supplement), counsel for respondents shall REPORT BY FAX to this Court on the status of Faraci's 1988 state petition;

5. This case is STAYED pending further Order of the Court;

6. Within 30 days from the date when he exhausts his right to review of his 1988 state petition, Faraci shall FILE a motion to lift the stay in this case; and

7. The Clerk shall TRANSFER this case from our Active Civil docket to our Civil Suspense docket.